**ASSET PURCHASE AGREEMENT**

*by and among*

**OAK RIDGE WASTE AND RECYCLING OF CT, LLC,**

**WASTE SERVICES, INC.**

*and*

**JOSEPH F. SPIEZIO, III**

**Dated and effective as of April 29, 2019**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ................................................................. 1

**ARTICLE II THE SALE OF THE ASSETS** ........................................ 6

2.1. Assets ..................................................................................... 6
2.2. Excluded Assets ..................................................................... 6

**ARTICLE III CONSIDERATION FOR THE ASSETS** ......................... 7

3.1. Purchase Price ........................................................................ 7
3.2. Gross Revenue Adjustment ..................................................... 7
3.3. Gross Revenue Adjustment Calculation ................................... 9
3.4. Disputes .................................................................................. 9
3.5. Payment of Gross Revenue Adjustment Balance ..................... 10
3.6. Assumption of Liabilities ........................................................ 10
3.7. Transfer and Property Taxes .................................................... 10
3.8. Brokers or Finders' Fees ......................................................... 10

**ARTICLE IV THE CLOSING AND CLOSING DELIVERIES** ............... 11

4.1. Closing Date ........................................................................... 11
4.2. Deliveries by Seller and Seller Principal at Closing ................. 11
4.3. Deliveries by Buyer at Closing ................................................ 12

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER AND SELLER PRINCIPAL** ........................................................... 12

5.1. Organization; Ownership. ....................................................... 12
5.2. Authority; No Conflict. ........................................................... 12
5.3. Taxes ...................................................................................... 13
5.4. Financial Information .............................................................. 14
5.5. Business Since the Benchmark Date ........................................ 14
5.6. Undisclosed Liabilities ........................................................... 14
5.7. Condition and Adequacy of the Assets ................................... 15
5.8. Contracts and Arrangements .................................................. 15
5.9. Employees .............................................................................. 15
5.10. Insurance ............................................................................... 16
5.11. Customers .............................................................................. 16
5.12. Business Relationships ........................................................... 17
5.13. Compliance with Legal Requirements; Governmental Authorizations. ....... 17
5.14. Environmental ........................................................................ 17
5.15. Legal Proceedings .................................................................. 19
5.16. Title to Assets ........................................................................ 20
5.17. Brokers or Finders .................................................................. 20

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER** ........................... 20

6.1. Authority; No Conflict. ........................................................... 20
6.2. Legal Proceedings .................................................................. 21
6.3. Full Disclosure ....................................................................... 21

**ARTICLE VII COVENANTS** ........................................................ 21

| | | |
|---|---|---|
| 7.1. | Employees and Employee Benefits. | 21 |
| 7.2. | Restrictive Covenants. | 22 |
| 7.3. | Business Confidential Information | 23 |
| 7.4. | Access to Records | 23 |
| 7.5. | Transition Services | 23 |
| 7.6. | Maintenance of Insurance Policies | 24 |
| 7.7. | Conduct of the Business | 24 |
| 7.8. | Notices of Certain Events | 24 |
| 7.9. | Right of First Refusal. | 24 |
| 7.10. | Option to Purchase Vehicles | 25 |

**ARTICLE VIII CONDITIONS TO CLOSING; TERMINATION** ................................. 26

| | | |
|---|---|---|
| 8.1. | Conditions to the Buyer's Obligation to Close | 26 |
| 8.2. | Conditions to the Seller and Seller Principal's Obligation to Close | 27 |
| 8.3. | Bankruptcy Condition | 28 |
| 8.4. | Termination | 28 |
| 8.5. | Effect of Termination | 28 |

**ARTICLE IX INDEMNIFICATION; REMEDIES** ................................. 29

| | | |
|---|---|---|
| 9.1. | Indemnification by Seller and Seller Principal | 29 |
| 9.2. | Indemnification by Buyer | 29 |
| 9.3. | Procedures for Payments of Indemnification Obligations | 30 |
| 9.4. | Survival | 30 |

**ARTICLE X MISCELLANEOUS** ................................. 30

| | | |
|---|---|---|
| 10.1. | Exhibits and Schedules | 30 |
| 10.2. | Publicity | 30 |
| 10.3. | Notices | 30 |
| 10.4. | Entire Agreement | 31 |
| 10.5. | Waivers and Amendments | 31 |
| 10.6. | Expenses | 32 |
| 10.7. | Governing Law | 32 |
| 10.8. | Assignment | 32 |
| 10.9. | Variations in Pronouns | 32 |
| 10.10. | Counterparts. | 32 |
| 10.11. | Further Assurances | 32 |
| 10.12. | Headings; Severability | 32 |
| 10.13. | Mutual Drafting | 32 |

EXHIBIT A – Form of Sale Order

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "*Agreement*"), dated and effective as of April 29, 2019, by and among **Oak Ridge Waste and Recycling of CT, LLC**, a Delaware limited liability company ("*Buyer*"), **Waste Services, Inc**., a New York corporation ("*Seller*") and **Joseph F. Spiezio, III** (the "*Seller Principal*"). Each of Buyer, Seller and Seller Principal are sometimes referred to herein as a "*Party*" and together, as the "*Parties*."

## WITNESSETH:

**WHEREAS**, on February 13, 2019, Seller filed a voluntary petition for reorganization under chapter 11, title 11 of the United States Code (11 U.S.C. § 101 et seq.) (the "*Bankruptcy Code*") in a Chapter 11 case under case number 19-22260 (the "*Chapter 11 Case*") currently pending before the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") pursuant to which Seller is acting as a debtor-in-possession;

**WHEREAS**, Seller desires to sell and Buyer desires to purchase certain assets owned by Seller relating to or used or useful in (i) Seller's roll-off waste hauling and recycling business in Putnam and northern Westchester Counties, New York (the "*Northern Westchester Roll-Off Business*"), (ii) Seller's roll-off waste hauling and recycling business in southern Westchester County, New York (the "*Southern Westchester Roll-Off Business*"), (iii) Seller's commercial and compactor waste hauling and recycling business in Putnam and northern Westchester Counties, New York (the "*Northern Westchester Commercial and Compactor Business*"), and (iv) Seller's commercial and compactor waste hauling and recycling business in southern Westchester County, New York (the "*Southern Westchester Commercial and Compactor Business*" and, together with the Northern Westchester Roll-Off Business, the Southern Westchester Roll-Off Business, and the Northern Westchester Commercial and Compactor Business, the "*Business*") as described in this Agreement and in accordance with Sections 105, 363, 365, 503 and other applicable provisions of the Bankruptcy Code;

**WHEREAS**, the Assets (as defined below) shall be sold in a private sale under Section 363 and Section 365 of the Bankruptcy Code;

**WHEREAS**, the Seller Principal owns 100% of the equity of Seller; and

**WHEREAS**, to induce Buyer to proceed with the transactions contemplated by this Agreement, Seller and Seller Principal are willing to make certain representations, warranties and covenants to Buyer.

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements contained herein, intending to be legally bound, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following items have the meanings specified or referred to in this Article I:

"**_Affiliate_**" shall mean with respect to any Person, (a) each Person that controls, is controlled by or is under common control with such Person or any Affiliate of such Person, (b) each of such Person's officers, directors, joint venturers, members, and partners, and (c) such Person's spouse, children, siblings, and parents.  For purposes of this definition, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting interests, by contract or otherwise.

"**_Agreement_**" shall have the meaning set forth in the preamble hereto.

"**_Assets_**" shall have the meaning set forth in Section 2.1 of this Agreement.

"**_Assigned Contracts_**" shall have the meaning set forth in Section 3.6 of this Agreement.

"**_Assignment and Assumption Agreement_**" shall have the meaning set forth in Section 4.2(b) of this Agreement.

"**_Assumed Liabilities_**" shall have the meaning set forth in Section 3.6 of this Agreement.

"**_Benchmark Date_**" shall have the meaning set forth in Section 5.5 of this Agreement.

"**_Bill of Sale_**" shall have the meaning set forth in Section 4.2(a) of this Agreement.

"**_Brokers' Fees_**" shall have the meaning set forth in Section 3.8 of this Agreement.

"**_Business_**" shall have the meaning set forth in the second recital hereto.

"**_Business Confidential Information_**" shall have the meaning set forth in Section 2.1 of this Agreement.

"**_Buyer_**" shall have the meaning set forth in the preamble hereto.

"**_Buyer's Indemnified Persons_**" shall have the meaning set forth in Section 9.1 of this Agreement.

"**_CERCLA_**" shall have the meaning set forth in Section 5.14(a) of this Agreement.

"**_Closing_**" shall have the meaning set forth in Section 4.1 of this Agreement.

"**_Closing Date_**" shall have the meaning set forth in Section 4.1 of this Agreement.

"**_Code_**" means the Internal Revenue Code of 1986, as amended.

"**_Company Contracts_**" shall have the meaning set forth in Section 5.8 of this Agreement.

"**_Dispute Settlement Date_**" shall have the meaning set forth in Section 3.4(b) of this Agreement.

4819-6388-5690, v. 20

"**_Employee Benefit Programs_**" shall have the meaning set forth in Section 5.9(b)(i) of this Agreement.

 "**_Encumbrance_**" shall mean any charge, claim, community property interest, condition, equitable interest, lien (including, without limitation, judgement liens), option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute or ownership.

"**_Environmental Laws_**" shall have the meaning set forth in Section 5.14(a) of this Agreement.

"**_Environmental Liabilities_**" shall have the meaning set forth in Section 5.14(k) of this Agreement.

"**_Environmental Permits_**" shall have the meaning set forth in Section 5.14(b) of this Agreement.

"**_ERISA_**" shall have the meaning set forth in Section 5.9(b)(i) of this Agreement.

"**_ERISA Affiliate_**" shall have the meaning set forth in Section 5.9(b)(ii) of this Agreement.

"**_Escrow Agent_**" shall have the meaning set forth in Section 3.1(b)(ii) of this Agreement.

"**_Escrow Agreement_**" shall have the meaning set forth in Section 3.1(b)(ii) of this Agreement.

"**_Escrow Amount_**" shall have the meaning set forth in Section 3.1(d)(ii) of this Agreement.

"**_Excluded Assets_**" shall have the meaning set forth in Section 2.2 of this Agreement.

"**_Governmental Authorization_**" shall mean any approval, consent, license, permit, waiver, or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

"**_Governmental Body_**" shall mean any: (a) nation state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); (d) multi-national organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, policy, regulatory, or taxing authority or power of any nature.

"**_Gross Revenue Adjustment_**" shall have the meaning set forth in Section 3.2(b) of this Agreement.

"**_Gross Revenue Adjustment Balance_**" shall have the meaning set forth in Section 3.5 of this Agreement.

4819-6388-5690, v. 20

"**_Hazardous Materials_**" shall have the meaning set forth in Section 5.14(d) of this Agreement.

"**_Initial Purchase Price Installment_**" shall have the meaning set forth in Section 3.1(b)(i) of this Agreement.

"**_Insurance Gap Period_**" shall have the meaning set forth in Section 7.6 of this Agreement.

"**_Legal Requirement_**" shall mean any federal, state, local, or municipal order, law, ordinance or regulation.

"**_Loss_**" or "**_Losses_**" shall have the meaning set forth in Section 9.1 of this Agreement.

"**_Material Adverse Effect_**" shall have the meaning set forth in Section 5.5 of this Agreement.

"**_Non-solicitation Period_**" shall have the meaning set forth in Section 7.2 of this Agreement.

"**_Non-competition Period_**" shall have the meaning set forth in Section 7.2 of this Agreement.

"**_Northern Westchester Commercial and Compactor Business_**" shall have the meaning set forth in the first recital hereto.

"**_Northern Westchester Commercial and Compactor Gross Revenue Adjustment_**" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"**_Northern Westchester Commercial and Compactor Gross Revenue Target_**" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"**_Northern Westchester Roll-Off Business_**" shall have the meaning set forth in the first recital hereto.

"**_Northern Westchester Roll-Off Gross Revenue Adjustment_**" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"**_Northern Westchester Roll-Off Gross Revenue Target_**" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"**_Notice of Exercise_**" shall have the meaning set forth in Section 7.10(b) of this Agreement.

"**_Organizational Documents_**" shall mean (a) the certificate of incorporation and the bylaws of a corporation; (b) the articles of organization and operating agreement of a limited liability company; (c) the certificate of limited partnership and the partnership agreement of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person; and (e) any amendment or restatement to any of the foregoing.

4819-6388-5690, v. 20

"**Person**" shall mean any individual, corporation (including any not-for-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"**Post-Closing Settlement Date**" shall have the meaning set forth in Section 3.5 of this Agreement.

"**Post-Closing Right of First Refusal**" shall have the meaning set forth in Section 7.11(b) of this Agreement.

"**Post-Closing Selling Party**" shall have the meaning set forth in Section 7.10(a) of this Agreement.

"**Post-Closing Transaction**" shall have the meaning set forth in Section 7.10(a) of this Agreement.

"**Post-Closing Transfer Notice**" shall have the meaning set forth in Section 7.10(a) of this Agreement.

"**Purchase Price**" shall have the meaning set forth in Section 3.1(a) of this Agreement.

"**Rehired Employees**" shall have the meaning set forth in Section 7.1 of this Agreement.

"**Restricted Territory**" shall have the meaning set forth in Section 7.2 of this Agreement.

"**Seller**" shall have the meaning set forth in the preamble hereto.

"**Seller Principal**" shall have the meaning set forth in the preamble hereto.

"**Seller's Indemnified Persons**" shall have the meaning set forth in Section 9.2 of this Agreement.

"**Seller's Knowledge**" shall mean, with respect to any representation or warranty made in this Agreement, the actual knowledge of the Seller Principal or the knowledge which Seller Principal would have if he had conducted a reasonable inquiry into the relevant subject matter.

"**Seller's Report**" shall have the meaning set forth in Section 3.4(a) of this Agreement.

"**Settlement Accountants**" shall have the meaning set forth in Section 3.4(b) of this Agreement.

"**Six-Month Northern Westchester Roll-Off Gross Revenue**" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"**Six-Month Southern Westchester Roll-Off Gross Revenue**" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"**Southern Westchester Commercial and Compactor Business**" shall have the meaning set forth in the first recital hereto.

4819-6388-5690, v. 20

"***Southern Westchester Commercial and Compactor Gross Revenue Adjustment***" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"***Southern Westchester Commercial and Compactor Gross Revenue Target***" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"***Southern Westchester Roll-Off Business***" shall have the meaning set forth in the first recital hereto.

"***Southern Westchester Roll-Off Gross Revenue Adjustment***" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"***Southern Westchester Roll-Off Gross Revenue Target***" shall have the meaning set forth in Section 3.2(a) of this Agreement.

"***Survival Period***" shall have the meaning set forth in Section 9.4 of this Agreement.

"***Three-Month Northern Westchester Commercial and Compactor Gross Revenue***" shall have the meaning set forth in Section 3.2(b) of this Agreement.

"***Three-Month Southern Westchester Commercial and Compactor Gross Revenue***" shall have the meaning set forth in Section 3.2(b) of this Agreement.

"***Transfer Taxes***" shall have the meaning set forth in Section 5.3(l) of this Agreement.

"***WARN Act***" shall have the meaning set forth in Section 5.9(a) of this Agreement.

## ARTICLE II
## THE SALE OF THE ASSETS

2.1.    <u>Assets</u>.  Subject to the terms and conditions set forth in this Agreement and approval of the Bankruptcy Court, Seller agrees to sell, convey, transfer, assign and deliver to Buyer (or one or more Affiliates of Buyer), and Buyer agrees to purchase from Seller, at the Closing, and as otherwise set forth herein, all of Seller's right, title and interest in and to all of the assets and properties of Seller with respect to the Business, other than the Excluded Assets (as defined below), including without limitation, those assets as set forth on <u>Schedule 2.1</u> (the "***Assets***"), free and clear of all Encumbrances (other than the Assumed Liabilities) in accordance with, and with all the protections afforded by Section 363 and Section 365 of the Bankruptcy Code.

2.2.    <u>Excluded Assets</u>.  All assets of Seller not included in the Assets are listed on <u>Schedule 2.2</u> (the "***Excluded Assets***").  The Excluded Assets shall be retained by Seller and shall not be sold, assigned, conveyed, transferred or delivered to Buyer.

# ARTICLE III
## CONSIDERATION FOR THE ASSETS

3.1.    Purchase Price.

(a)    In consideration of the sale of the Assets by Seller to Buyer, Buyer shall pay to Seller the sum of (i) Seven Million Four Hundred Eighty-Seven Thousand Five Hundred Dollars ($7,487,500), minus (ii) the Gross Revenue Adjustment (as defined herein), if any (such sum, as so adjusted pursuant to the terms hereof, being hereinafter referred to as the "***Purchase Price***").

(b)    At the Closing, Buyer shall:

(i)    pay Seller the sum of Five Million Eight Hundred Thirty-Seven Thousand Five Hundred Dollars ($5,837,500) (the "***Initial Purchase Price Installment***"), which sum shall be paid to Seller in cash by wire transfer in immediately available funds to a bank account designated by Seller; and

(ii)    deposit One Million Six Hundred Fifty Thousand Dollars ($1,650,000) (the "***Escrow Amount***") by wire transfer or other delivery of immediately available funds to an escrow agent mutually agreed by the Parties (the "***Escrow Agent***"). Escrow Agent shall hold the Escrow Amount in escrow pursuant to the terms and conditions of an escrow agreement in form and substance as mutually acceptable by the Parties (the "***Escrow Agreement***").

(c)    On each Post-Closing Settlement Date, Seller shall pay Buyer the respective Gross Revenue Adjustment Balance (as defined herein) as of such date, if any.

3.2.    Gross Revenue Adjustment.

(a)    If gross revenue (billable revenue) generated from the Northern Westchester Roll-Off Business for the one hundred eighty (180) day period immediately following the Closing Date (such revenues being referred to herein as the "***Six-Month Northern Westchester Roll-Off Gross Revenue***") is less than Three Hundred Twenty-Five Thousand Dollars ($325,000) (the "***Northern Westchester Roll-Off Gross Revenue Target***"), Buyer shall be entitled to the Northern Westchester Roll-Off Gross Revenue Adjustment. For purposes of this Agreement, the "***Northern Westchester Roll-Off Gross Revenue Adjustment***" shall be an amount equal to the sum of the Northern Westchester Roll-Off Gross Revenue Target less the Six-Month Northern Westchester Roll-Off Gross Revenue, multiplied by two (2). For the avoidance of doubt, if the Six-Month Northern Westchester Roll-Off Gross Revenue is equal to or exceeds Three Hundred Twenty-Five Thousand Dollars ($325,000) the Northern Westchester Roll-Off Gross Revenue Adjustment shall be equal to zero (0).

(b)    If gross revenue (billable revenue) generated from the Southern Westchester Roll-Off Business for the one hundred eighty (180) day period immediately following the Closing Date (such revenues being referred to herein as the "***Six-Month Southern Westchester Roll-Off Gross Revenue***") is less than Seven Hundred Seven Thousand Five Hundred Dollars ($707,500) (the "***Southern Westchester Roll-Off Gross Revenue Target***"), Buyer shall be entitled to the Southern Westchester Roll-Off Gross Revenue Adjustment. For purposes of this Agreement, the "***Southern Westchester Roll-Off Gross Revenue Adjustment***" shall be an amount

equal to the sum of the Southern Westchester Roll-Off Gross Revenue Target less the Six-Month Southern Westchester Roll-Off Gross Revenue, multiplied by two (2). For the avoidance of doubt, if the Six-Month Southern Westchester Roll-Off Gross Revenue is equal to or exceeds Seven Hundred Seven Thousand Five Hundred Dollars ($707,500), the Southern Westchester Roll-Off Gross Revenue Adjustment shall be equal to zero (0).

(c)     If gross revenue (billable revenue plus recycling rebates) generated from the Northern Westchester Commercial and Compactor Business for the ninety (90) day period immediately following the Closing Date (such revenues being referred to herein as the "***Three-Month Northern Westchester Commercial and Compactor Gross Revenue***") is less than Two Hundred Ninety Thousand Dollars ($290,000) (the "***Northern Westchester Commercial and Compactor Gross Revenue Target***"), Buyer shall be entitled to the Northern Westchester Commercial and Compactor Gross Revenue Adjustment.  For purposes of this Agreement, the "***Northern Westchester Commercial and Compactor Gross Revenue Adjustment***" shall be an amount equal to the sum of the Northern Westchester Commercial and Compactor Gross Revenue Target less the Three-Month Northern Westchester Commercial and Compactor Gross Revenue, multiplied by three (3). For the avoidance of doubt, if the Three-Month Northern Westchester Commercial and Compactor Gross Revenue is equal to or exceeds Two Hundred Ninety Thousand Dollars ($290,000) the Northern Westchester Commercial and Compactor Gross Revenue Adjustment shall be equal to zero (0).

(d)     If gross revenue (billable revenue plus recycling rebates) generated from the Southern Westchester Commercial and Compactor Business for the ninety (90) day period immediately following the Closing Date (such revenues being referred to herein as the "***Three-Month Southern Westchester Commercial and Compactor Gross Revenue***") is less than Six Hundred Ninety-Two Thousand Five Hundred Dollars ($692,500) (the "***Southern Westchester Commercial and Compactor Gross Revenue Target***"), Buyer shall be entitled to the Southern Westchester Commercial and Compactor Gross Revenue Adjustment.  In the event the gross revenue generated from the Southern Westchester Commercial and Compactor Business for the ninety (90) day period immediately following the Closing Date exceeds the Southern Westchester Commercial and Compactor Gross Revenue Target by more than ten (10%) percent than Seller shall be entitled to an upward adjustment as calculated herein.  For purposes of this Agreement, the "***Southern Westchester Commercial and Compactor Gross Revenue Adjustment***" shall, if the gross revenue is less than the applicable Revenue Target,  be an amount equal to the sum of the Southern Westchester Commercial and Compactor Gross Revenue Target less the Three-Month Southern Westchester Commercial and Compactor Gross Revenue, multiplied by three (3), and if the gross revenue is 110% of more of the Revenue Target, by an amount to be agreed by the Parties on the Post-Closing Settlement Date.  For the avoidance of doubt, if the Three-Month Southern Westchester Commercial and Compactor Gross Revenue is equal to or exceeds Six Hundred Ninety-Two Thousand Five Hundred Dollars ($692,500) the Southern Westchester Commercial and Compactor Gross Revenue Adjustment shall be equal to zero (0).

(e)     For purposes of this Agreement, "***Gross Revenue Adjustment***" shall refer to the Southern Westchester Commercial and Compactor Gross Revenue Adjustment together with the Northern Westchester Commercial and Compactor Gross Revenue Adjustment, the Northern Westchester Roll-Off Gross Revenue Adjustment and the Southern Westchester Roll-Off Gross Revenue Adjustment.

3.3.     Gross Revenue Adjustment Calculation.  As soon as practical (and in no event later than (i) with respect to the Northern Westchester Commercial and Compactor Gross Revenue Adjustment, one hundred twenty (120) days after the Closing Date, (ii) with respect to the Southern Westchester Commercial and Compactor Gross Revenue Adjustment, one hundred twenty (120) days after the Closing Date, (iii) with respect to the Northern Westchester Roll-Off Gross Revenue Adjustment, two hundred ten (210) days after the Closing Date), and (iv) with respect to the Southern Westchester Roll-Off Gross Revenue Adjustment, two hundred ten (210) days after the Closing Date), Buyer shall cause to be prepared and delivered to Seller a calculation of the applicable Gross Revenue Adjustment, including such information and/or documentation with respect to the determination of such Gross Revenue Adjustment as may be appropriate to support such calculation.  Seller and its accountants shall be entitled to review Buyer's calculation of each Gross Revenue Adjustment.

3.4.     Disputes.  The following Sections 3.4(a) and (b) set forth the procedures for resolving disputes among the Parties with respect to the determination of the Gross Revenue Adjustments:

(a)     Within thirty (30) days after delivery to Seller of Buyer's calculation of each Gross Revenue Adjustment pursuant to Section 3.3, Seller may deliver to Buyer a written report (the "***Seller's Report***") advising Buyer either that Seller (i) agrees with Buyer's calculations of such Gross Revenue Adjustment or (ii) deems that one or more adjustments are required.  If Buyer shall concur with the adjustments proposed by Seller, or if Buyer does not object thereto in a writing delivered to Seller within thirty (30) days after Buyer's receipt of the Seller's Report, the calculations of the applicable Gross Revenue Adjustment shall become final and shall not be subject to further review, challenge or adjustment absent fraud.

(b)     In the event that Seller submits a Seller's Report and Buyer and Seller are unable to resolve the disagreements set forth in such report within thirty (30) days after the date of the Seller's Report, then such disagreements shall be referred to Marks Paneth LLP or if such firm is not available, to a firm of nationally recognized independent certified public accountants selected by mutual agreement of Seller and Buyer, as the case may be (the "***Settlement Accountants***"), and the determination of the Settlement Accountants shall be final and shall not be subject to further review, challenge or adjustment absent fraud.  The Parties shall direct the Settlement Accountants to use their best efforts to reach a determination not more than thirty (30) days after such referral.  Buyer and Seller shall act reasonably in attempting to resolve any disagreements which may arise between them regarding the determination of the applicable Gross Revenue Adjustment, the referral of disagreements to the Settlement Accountants, and the scope of their engagement of the Settlement Accountants (it being agreed that the Settlement Accountants shall resolve all disputes regarding such Gross Revenue Adjustment based solely on written submissions from the Parties, with no discovery permitted), all with a view to minimizing the costs which are to be incurred in order to resolve such disagreements. The costs and expenses of the services of the Settlement Accountants shall be borne and paid by the Party that the Settlement Accountants determines to be least correct (in net dollar terms) in the aggregate in its determination of the Gross Revenue Adjustment.  The date on which any disputes under this Section 3.4 are resolved are referred to herein as the "***Dispute Settlement Date***".

3.5.    Payment of Gross Revenue Adjustment Balance.  On the later of (i) with respect to the Northern Westchester Commercial and Compactor Gross Revenue Adjustment, the 150th day after the Closing Date, (ii) with respect to the Southern Westchester Commercial and Compactor Gross Revenue Adjustment, the 150th day after the Closing Date, (iii) with respect to the Northern Westchester Roll-Off Gross Revenue Adjustment, the 240th day after the Closing Date, (iv) with respect to the Southern Westchester Roll-Off Gross Revenue Adjustment, the 240th day after the Closing Date, or (v) in the event of a dispute subject to Section 3.4 hereof, the fifth (5th) business day following the applicable Dispute Settlement Date (such later date being referred to herein as the "***Post-Closing Settlement Date***"), Buyer and Seller shall deliver joint written instructions to, and shall take all other action required to cause, the Escrow Agent to pay Buyer each Gross Revenue Adjustment plus the total amount of indemnification claims made pursuant to Section 9.1 pending against Seller (if any), by wire transfer of immediately available funds to the account designated by Buyer.  To the extent that all or any portion of any Gross Revenue Adjustment exceeds the Escrow Amount (as reduced by the total amount of indemnification claims made pursuant to Section 9.1 pending against Seller (if any)), Seller shall pay to Buyer in cash by wire transfer in immediately available funds to such bank account as designated by Buyer an amount (if any) equal to such excess (the "***Gross Revenue Adjustment Balance***").

3.6.    Assumption of Liabilities.  As further consideration for the sale and transfer of the Assets, Buyer shall assume and agree to pay, perform, fulfill and discharge (in the ordinary course of business) only those liabilities and obligations (the "***Assumed Liabilities***") of Seller under the contracts, agreements and similar documents listed on Schedule 2.1 (the "***Assigned Contracts***") (other than any liability for breach or nonperformance of any such contract arising, or based on events occurring or circumstances existing, prior to the Closing Date or any amounts due as of the Closing Date); provided, however, that if any such Assigned Contract requires a consent to the assignment thereof to Buyer and such consent has not been obtained, then this Agreement, to the extent permitted by law, shall constitute an equitable assignment by Seller to Buyer of all rights, benefits, title and interest, liabilities and obligations under such Assigned Contract.  Otherwise, Buyer does not assume and will not be liable for any liabilities or obligations of Seller.  For purposes of this Agreement, all liabilities and obligations of Seller other than the Assumed Liabilities are referred to as "***Excluded Liabilities***."

3.7.    Transfer and Property Taxes.  Buyer shall pay all sales, use and transfer taxes, if any, arising out of the transfer of the Assets. Seller shall pay all state, local or federal income taxes arising from the transfer of the Assets or related to any period before the Closing Date. Buyer shall not be responsible for any business, occupation, withholding or similar tax, or for any taxes of any kind related to any period before the Closing Date.

3.8.    Brokers or Finders' Fees.  Seller shall pay all fees, commissions, expenses, obligations or other liabilities, contingent or otherwise, for brokers, finders or other agents retained by Seller in connection with the transaction contemplated by this Agreement ("***Brokers' Fees***"). The Parties agrees that under no circumstances shall Buyer be liable for any such fees and, to the extent that Buyer shall incur any Losses arising from Brokers' Fees, Buyer shall be indemnified in full by Seller pursuant to Section 9.1(d) hereof.

3.9    Allocation of the Purchase Price. Seller and Buyer agree and acknowledge that the Purchase Price is allocated among the various types of Assets as set forth on Schedule 3.9. Seller

and Buyer agreed to abide by the allocation of the Purchase Price set forth on Schedule 3.9, subject to any adjustments required hereunder. For income tax purposes, Seller and Buyer shall report the transaction in accordance with such allocation as required by the Internal Revenue Service and any state tax authority(ies). Seller and Buyer further agree that they shall not take, or cause or permit to be taken, any position on any tax return which would be inconsistent with, prejudice or otherwise adversely affect the allocations agreed to by the parties as set forth above, and that each will notify the other party as expeditiously as possible in the event that any taxing authority formally or informally takes a position contrary to the allocation of the Purchase Price set forth on Schedule 3.9. Seller and Buyer agree that allocation of the Purchase Price is not intended, and shall not be construed, as an indication or inference of, nor limitation on, the damages that Buyer may be entitled to if Seller is found to have breached any term or condition of this Agreement.

## ARTICLE IV
## THE CLOSING AND CLOSING DELIVERIES

4.1.     Closing Date.  Subject to the terms and conditions set forth herein, the closing of the purchase and sale of the Assets (the "*Closing*") shall take place within thirty (30) days following the satisfaction or waiver of all conditions set forth in Article VIII (other than conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions), it being the Parties intention that such date shall be on or about fourteen (14) days after a final order approving the Sale is issued by the United States Bankruptcy Court for the Southern District of New York; , or on such alternative date as the Parties may mutually agree, and the Closing shall be effective as of 12:01 a.m. on such date (the "*Closing Date*").

4.2.     Deliveries by Seller and Seller Principal at Closing.  At the Closing, Seller and Seller Principal shall deliver to Buyer the following:

(a)     A Bill of Sale for the Assets in form and substance satisfactory to Buyer (the "*Bill of Sale*"), duly executed by Seller;

(b)     An Assignment and Assumption Agreement in form and substance satisfactory to Buyer (the "*Assignment and Assumption Agreement*"), duly executed by Seller;

(c)     The Escrow Agreement, duly executed by Seller and Escrow Agent;

(d)     A certificate of good standing, dated as of a date within ten (10) days prior to the Closing, issued by the State of New York to the effect that Seller legally exists and is in good standing;

(e)     Evidence satisfactory to Buyer of satisfaction and release of all Encumbrances covering the Assets (if any);

(f)     The Seller Closing Certificate;

(g)     The Seller Officer's Certificate; and

(h)     Such other documents as are required by the terms of this Agreement or as may be reasonably requested by Buyer.

4.3.     Deliveries by Buyer at Closing.  At the Closing, Buyer shall deliver to Seller the following:

(a)     Payment of the Initial Purchase Price Installment in the manner described in Section 3.1(b)(i) above;

(b)     Deposit of the Escrow Amount with the Escrow Agent in accordance with Section 3.1 (b)(ii) above;

(c)     The Bill of Sale, duly executed by Buyer;

(d)     The Assignment and Assumption Agreement, duly executed by Buyer;

(e)     The Escrow Agreement, duly executed by Buyer;

(f)     The Buyer Closing Certificate; and

(g)     Such other documents as are required by the terms of this Agreement or as may be reasonably requested by Seller.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF
## SELLER AND SELLER PRINCIPAL

Seller and Seller Principal, jointly and severally, represent and warrant to Buyer as follows:

5.1.     Organization; Ownership.

(a)     Seller is a New York corporation duly incorporated, validly existing and in good standing under the laws of New York. Seller (i) has the full corporate power and authority to own and operate the Assets and carry on the operations of the Business as such operations are now being conducted, (ii) is duly qualified to do business and is in good standing, and is duly licensed, authorized or qualified to transact business in each jurisdiction in which the ownership or lease of real property or the conduct of its business requires it to be so qualified, and (iii) has all government licenses, permits, approvals and other authorizations necessary to own its properties and assets and carry on the Business as it is now being conducted.

(b)     Seller Principal is the sole equity owner of the Seller.

5.2.     Authority; No Conflict.

(a)     This Agreement constitutes the legal, valid and binding obligation of Seller enforceable against it in accordance with its terms, except as limited by bankruptcy and insolvency laws and by other laws affecting the rights of creditors generally.  Seller has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and such other documents to be executed and delivered in connection with the transactions contemplated hereby and to perform its obligations under this Agreement.

4819-6388-5690, v. 20

(b)     Neither the execution and delivery of this Agreement nor the consummation or performance of the transactions contemplated hereby will, directly or indirectly (i) contravene, conflict with, or result in a violation of (A) any provision of the Organizational Documents of Seller, or (B) any resolution adopted by the members of Seller, (ii) contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify, any Governmental Authorization that is held by Seller in relation to the Business or that otherwise relates to any of the Assets owned or used by Seller, or (iii) result in the imposition or creation of any Encumbrance upon or with respect to any of the Assets.

(c)     Except as set forth on Schedule 5.2(c) attached hereto, Seller is not required to give any notice to or obtain any approval or consent from any Person in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

5.3.     <u>Taxes</u>.

(a)     All taxes that are due and payable and which could give rise to an Encumbrance on any Assets have been duly and timely paid. There are no liens for taxes on any Assets of Seller.

(b)     Seller has withheld from every employee, former employee, customer, independent contractor, creditor, stockholder and any other applicable payee the required amounts in compliance with all Tax withholding provisions of applicable federal, state, local and foreign laws (including, without limitation, income, social security, and employment Tax withholding), and has remitted, or will remit on a timely basis, such amounts to the appropriate taxing authority.

(c)     All tax returns for taxes which could give rise to an Encumbrance on any Assets have been duly and timely filed, except for those returns for which the time for filing thereof has been validly extended, and such tax returns are true, correct and complete in all material respects.

(d)     There are no pending or, to Seller's Knowledge, threatened, tax audits, assessments, administrative proceedings, investigations, court proceedings or other actions for or relating to any claimed, proposed or assessed liability in respect of taxes of Seller, and there are no matters under discussion, audit or appeal with any governmental authorities, or any matters known to Seller, with respect to taxes that could reasonably be expected to result in an additional liability for taxes with respect to any Assets.

(e)     None of the Assets is an asset or property that Buyer or any of its affiliates is or will be required to treat as being (i) owned by any other Person pursuant to the provisions of Section 168(f)(8) of the Code of 1954, as amended, and in effect immediately before the enactment of the Tax Reform Act of 1986, or (ii) tax exempt use property within the meaning of Section 168(h)(1) of the Code.

(f)     Seller has retained and provided to Buyer the necessary evidence of exemption from sales and other taxes to support non-collection of Tax with respect thereto.

(g)     No claim has been made in writing by an authority in a jurisdiction where Seller does not file tax returns that Seller is or may be subject to taxation by that jurisdiction.

(h)     Seller has properly and timely collected, paid and remitted all federal, state and local transfer, documentary, stamp, sales, use or similar taxes, and including interest and penalties thereon ("***Transfer Taxes***") in respect of any transaction to which it has been a party and has not entered into any transaction in respect of which it will or may have a liability for Transfer Taxes or additional Transfer Taxes after the Closing as a result of or by reference to any matter arising or event occurring before the Closing, except those arising in the ordinary course of business.

(i)     Seller has not claimed any relief in respect of taxes which will or may be withdrawn as a result of the Closing nor will the entering into of this Agreement or the Closing give rise to a liability for Tax for Seller which would not otherwise have arisen.

(j)     Seller is not required to make any disclosure to the IRS with respect to (i) a "***reportable transaction***" within the meaning of Sections 6111 and 6707A of the Code and the Treasury Regulations promulgated thereunder or (ii) any "***listed transaction***" within the meaning of Sections 6111 and 6707A of the Code and the Treasury Regulations promulgated thereunder. Seller has disclosed on its US federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of US federal income Tax within the meaning of Section 6662 of the Code.

(k)     Seller is not a party to any Tax allocation or sharing agreement, and Seller (i) has not been a member of an affiliated Group (other than a group the common parent of which was Seller), (ii) has no liability for taxes of any Person under Reg. Section 1.1502-6 (or any similar provision of state, local, or foreign law), and (iii) has no liability for the taxes of any other person as a result of successor liability, transferee liability, joint and several liability, contractual liability, secondary liability or otherwise.

5.4.     Financial Information.  All financial information provided to Buyer by Seller with respect to the Business is true and correct in all respects as of the dates and for the periods indicated.

5.5.     Business Since the Benchmark Date.  Except as set forth on Schedule 5.5, since April 1, 2019 (the "***Benchmark Date***"), the Business has been conducted in the ordinary course of business and in substantially the same manner as it was before the Benchmark Date. Since the Benchmark Date, there has been no change in the business, condition (financial or otherwise), properties or operations of the Business, and there has not occurred any other event, which in either case has had a material adverse effect on the business, operations, prospects, properties or condition (financial or otherwise) of the Business taken as a whole, including, without limitation, the Assets and Assumed Liabilities ("***Material Adverse Effect***").

5.6.     Undisclosed Liabilities.  Except as otherwise disclosed in Schedule 5.6 hereto, Seller does not have any material obligation or liability, of any nature, either individually or in the aggregate, whether accrued, absolute, contingent or otherwise, whether matured or non-matured and whether due or to become due, asserted or unasserted, known or unknown, except (a) contract

obligations under the Company Contracts (as defined below), (b) liabilities disclosed in the Schedules to this Agreement, and (c) liabilities that would not individually or in the aggregate have a Material Adverse Effect.

5.7.  <u>Condition and Adequacy of the Assets</u>.  The tangible assets included in the Assets are in good operating condition and repair, ordinary wear and tear excepted, and are adequate and suitable for the purposes for which they are currently used and are in compliance with all applicable Legal Requirements, including, without limitation, all New York Department of Transportation requirements.  The Assets are, in the aggregate, substantially all of the assets which are necessary to operate the Business in the manner in which the Business was operated during the 12-month period ending on the Benchmark Date and since such time, except for additions thereto and deletions therefrom in the ordinary course of business and consistent with past practice.

5.8.  <u>Contracts and Arrangements</u>.  <u>Schedule 5.8</u> hereto lists all Company Contracts related to the Business.  As used herein, "***Company Contracts***" means any contract, agreement, lease or arrangement (written or oral) to which Seller is a party.  <u>Schedule 5.8</u> specifies those Company Contracts, the assignment of which requires the consent of a third party.  Provided that any requisite consent to the assignment of Company Contracts to Buyer is obtained, each of the contracts and leases which is assigned to and assumed by Buyer on the Closing Date is valid and in full force and effect and is a binding obligation of Seller and, to the Seller's Knowledge, the other parties thereof, and is enforceable in accordance with its terms against Seller and to the Seller's Knowledge, each such other party.  Seller and, to the Seller's Knowledge, each other party are in compliance with their respective obligations thereunder and there is no existing default, event of default or other event under such Company Contracts which, with or without notice or lapse of time or both, would constitute a default by Seller or an event of default by Seller under any such contract and would result in a Material Adverse Effect.  To Seller's Knowledge, there is not any loss or termination or any threatened loss or termination of any Assigned Contract.  Seller has made available to Buyer complete copies (or written summaries of oral contracts) of all of the Company Contracts.

5.9.  <u>Employees</u>.

(a)  Seller has delivered to Buyer a list of the names and salaries or rates of commission, date of employment, job title and number of vacation hours used since January 1, 2018 for all the full and part-time employees of the Business.  Except as set forth on <u>Schedule 5.9</u>, Seller is not a party to any collective bargaining agreement or any other labor agreement covering or relating to any of the employees of Seller, and Seller has not recognized or received a demand for recognition of any collective bargaining representative.  Seller has complied in all material respects with all laws relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, and occupational safety and health in connection with its operation of the Business and the employees.  Seller has not, within the last twelve months, engaged in a "***mass layoff***" or "***plant closing***" as defined by the Worker Adjustment and Retraining Notification Act of 1988, as amended ("***WARN Act***") or any similar state or local "plant closing" laws with respect to the employees.

(b)  Employee Benefit Programs; ERISA.

(i)        Seller has delivered to Buyer correct and complete copies of each employment, bonus, deferred compensation, pension, stock option, stock appreciation right, profit-sharing or retirement plan, arrangement or practice, each medical, vacation, retiree medical, severance pay plan, and each other agreement or fringe benefit plan, arrangement or practice, of Seller, whether legally binding or not, including all "***employee benefit plans***," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), which covered one or more employees of the Business ("***Employee Benefit Programs***").  Except as set forth on Schedule 5.9, Seller and its ERISA Affiliates (as defined below) have complied in all material respects with the terms of all Employee Benefit Programs and all laws and regulations with respect to such programs, including the Code and ERISA, and no default exists with respect to the obligations of the Business or any of its ERISA Affiliates under any such Employee Benefit Programs.

(ii)        Except as set forth on Schedule 5.9, neither Seller nor any of its ERISA Affiliates has provided or is required to provide, security to any pension plan or to any single-employer plan of Seller or an ERISA Affiliate pursuant to Section 401(a)(29) of the Code. "***ERISA Affiliate***" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "***controlled group***" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

5.10.        Insurance.

(a)        Schedule 5.10 contains an accurate and complete description of all policies of property, fire and casualty, product liability, workers' compensation, and other forms of insurance held by Seller in connection with the Business.  True, correct and complete copies of such insurance policies have been delivered to Buyer.

(b)        All policies listed on Schedule 5.10 (i) are valid, outstanding, and enforceable policies, (ii) provide adequate insurance coverage for the Assets and the operations of the Business for all material risks normally insured against by a person or entity carrying on the same business.

(c)        Seller has not received (i) any notice of cancellation of any policy listed on Schedule 5.10 or refusal of coverage thereunder, (ii) any written notice that any issuer of such policy has filed for protection under applicable bankruptcy laws or is otherwise in the process of liquidating or has been liquidated, or (iii) any other written notice that such policies are no longer in full force or effect or that the issuer of any such policy is no longer willing or able to perform its obligations thereunder.  There are no claims pending or threatened under any policies listed on Schedule 5.10.

5.11.        Customers.  Buyer has been provided with a complete and accurate list of the names and addresses of all of the customers of the Business as of the date of this Agreement, showing the service level provided by the Seller to the customer and the approximate aggregate total sales in dollars to each such customer during the prior twelve (12) month period. Except as disclosed in Schedule 5.11, or as may be afforded to any Customer by the rules and regulations of

the Westchester County Solid Waste Commission, Seller has not received any written or other communication from any such customer of any intention or threat to terminate or materially reduce purchases from Seller and, to Seller's Knowledge, no such action is being considered.

5.12.  <u>Business Relationships</u>.  No Person controlling a customer account has canceled or otherwise terminated, or threatened in writing or, to Seller's Knowledge, intends to cancel or otherwise terminate, its relationship with the Business or materially alter the amount of business that they are presently doing with the Business relating to the customer account.

5.13.  <u>Compliance with Legal Requirements; Governmental Authorizations</u>.

(a)  With respect to the ownership or use of any of the Assets, Seller is, and at all times has been, in compliance with each Legal Requirement that is or was applicable to it.

(b)  <u>Schedule 5.13</u> contains a complete and accurate list of each Governmental Authorization that is held by Seller and that relates to the conduct of the Business or the ownership or use of any of the Assets. Each Governmental Authorization listed or required to be listed in <u>Schedule 5.13</u> is valid and in full force and effect. Except as set forth in <u>Schedule 5.13</u>:

(i)  Seller is and at all times has been in compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in <u>Schedule 5.13</u>; and

(ii)  Except as set forth in Schedule 5.13, Seller has not received any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible or potential revocation, withdrawal, suspension, cancellation, termination of or modification to any Governmental Authorization by the relevant Governmental Body.

(c)  The Governmental Authorizations listed in <u>Schedule 5.13</u> collectively constitute all of the Governmental Authorizations necessary to permit Seller to lawfully conduct and operate the Business in the manner it currently conducts and operates and to permit Seller to own and use its Assets in the manner in which it currently owns and uses such Assets.

5.14.  <u>Environmental</u>.  Except as set forth in <u>Schedule 5.14</u>:

(a)  The Seller is operating, and for the past five (5) years has operated, the Business in compliance with all Environmental Laws to the extent that such Environmental Laws apply to the Business. For purposes of this Agreement, the term "***Environmental Laws***" means all laws, rules, regulations, statutes, ordinances, decrees or orders of any Governmental Body relating to (i) the control of any potential pollutant or protection of human health or the environment (including air, water or land), (ii) solid, gaseous or liquid waste generation, handling, treatment, storage, disposal or transportation, and (iii) exposure to hazardous, toxic or other substances alleged to be harmful, and includes without limitation, (1) the terms and conditions of any license, Permit, approval, or other authorization by any Governmental Body, and (2) judicial, administrative, or other regulatory decrees, judgments, and orders of any Governmental Body. The term "***Environmental Laws***" shall include, but not be limited to the following statutes and the

17

regulations promulgated thereunder, as amended: the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11011 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act ("***CERCLA***"), 42 U.S.C. § 9601 *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, and any state, county, or local laws similar thereto.

(b)     The Seller has obtained all permits required by Environmental Laws to operate the Business in the manner it is currently being operated ("***Environmental Permits***"), including, without limitation, any storm water and petroleum storage permits. All Environmental Permits are validly issued and in full force and effect, and timely renewals have been filed for any permits that are due to expire within the next six months. The Seller is and for the past five (5) years has been operating in compliance with all Environmental Permits.

(c)     There are no requirements under Environmental Laws to the extent that such Environmental Laws apply to the Business that will obligate the Buyer, or conditions that will cause the Buyer to be obligated, to make capital improvements to any of the assets of the Seller or incur other significant expenses with respect to the Assets in order to remain, or to operate the Business, in compliance with Environmental Laws.

(d)     There is no pending or, to the Seller's Knowledge, threatened litigation by any person or before any court or any other Governmental Authority directed against the Seller, the Business or any Assets that pertain or relate to (i) any obligations or liabilities, contingent or otherwise, under any Environmental Law, (ii) violations or alleged violations of Environmental Laws, (iii) personal injury or property damage claims relating to the Release or threatened Release of Hazardous Materials, or (iv) response, removal, or remedial costs under CERCLA or any similar state law. For purposes of this Agreement, the term "***Hazardous Materials***" means any (i) toxic or hazardous materials or substances; (ii) solid wastes, including asbestos, polychlorinated biphenyls, mercury, flammable or explosive materials; (iii) radioactive materials; (iv) petroleum or petroleum products (including crude oil); and (v) any other chemical, pollutant, contaminant, substance or waste that is regulated or for which liability or standards of care are imposed under any Environmental Law. For purposes of this Agreement, the term "***Release***" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing.

(e)     No portion of any property currently or formerly owned, leased or operated by the Seller is part of a site listed on the National Priorities List under CERCLA or any similar ranking or listing under any state law.

(f)     The Seller has not generated, manufactured, stored, transported, treated, recycled, disposed of, Released or otherwise handled in any way any Hazardous Materials on, at, under, or about any property currently or formerly owned, leased or operated by the Seller, except in compliance with Environmental Laws.

4819-6388-5690, v. 20

(g)     The Seller has not transported or arranged for the transportation of any Hazardous Materials generated by the Seller in the conduct of its business to any location which is listed on the National Priorities List under CERCLA, or on any similar state list, or which is subject of federal, state or local enforcement actions or other investigations that may lead to claims against the Seller for clean-up costs, remedial work, damages to natural resources or personal injury claims, including, but not limited to, claims under CERCLA.

(h)     The Seller is not operating, and is not required to be operating, its business or any of its assets under any compliance or consent order, decree or agreement issued or entered into under Environmental Laws.

(i)     No asbestos, asbestos containing materials or polychlorinated biphenyls are present at or in any of the Assets.

(j)     There are no underground storage tanks located on, at or under any property currently or formerly owned, leased or operated by the Seller.

(k)     There are no Environmental Liabilities arising from, or related to, the ownership or operation of the Assets, and there are no Environmental Liabilities that the Seller has assumed, retained or otherwise agreed to, by contract or otherwise. For purposes of this Agreement, the term "***Environmental Liabilities***" means any and all liabilities, obligations, responsibilities, claims, suits, losses, costs (including remediation, removal, response, abatement, clean-up, investigative, or monitoring costs and any other related costs and expenses), other causes of action recognized now or at any later time, damages, settlements, expenses, charges, assessments, liens, penalties, fines, pre-judgment and post-judgment interest, attorney's fees and other legal fees (a) pursuant to any agreement, order, notice, requirement, responsibility, or directive (including directives embodied in Environmental Laws to the extent that such Environmental Laws apply specifically and directly to the Business), injunction, judgment or similar documents (including settlements) arising out of or in connection with any Environmental Laws, or (b) pursuant to any claim by a Governmental Authority or other Person for personal injury, property damage, damage to natural resources, remediation, or similar costs or expenses incurred or asserted by such entity or person pursuant to Environmental Laws to the extent that such Environmental Laws apply specifically and directly to the Business, common law, or statute.

(l)     The Seller has provided to the Buyer copies of all material environmental audits, assessments, investigations, studies, tests or evaluations of the Assets, or any property currently or formerly owned, leased or operated by the Seller that are in the possession of or subject to the control of the Seller, any of its affiliates or any of their consultants, agents or representatives.

5.15.   <u>Legal Proceedings</u>.  Except as set forth on <u>Schedule 5.15</u>, Seller is not subject to any outstanding judgments. Except as set forth on Schedule 5.15. Seller has not been operating under and is not subject to, or in default with respect to, any order, writ, injunction, judgment or decree of any Governmental Body.   Except as set forth on Schedule 5.15., neither Seller nor any of its officers, agents or affiliates has received any inquiry, written or oral, from any Governmental Body concerning the operations of the Business or Seller's ownership of the Assets during the five (5) year period prior to the date of this Agreement.  Except as set forth on Schedule 5.15., there is no litigation, arbitration, audit, administrative proceeding, investigation, court proceeding, or other

action(s) for or relating to any claimed, proposed, or accrued liability, pending by or against, or to Seller's Knowledge threatened against, Seller related to or affecting any of the Assets.

5.16.    Title to Assets.  The delivery of the Assets to Buyer pursuant to this Agreement and subject to the Order of the United States Bankruptcy Court of the Southern District of New York, will vest in Buyer legal and valid title to the Assets, free and clear of all Encumbrances.

5.17.    Brokers or Finders.  Except as set forth on Schedule 5.17, neither Seller nor any of its agents has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents, commissions or other similar payment in connection with this Agreement or the transactions contemplated hereby.

5.18.    Legal Advice. Seller has had the opportunity to seek independent legal advice prior to the execution and delivery of this Agreement and have availed themselves of that opportunity prior to signing this Agreement.  Seller is familiar with the covenants and obligations set forth herein, including, without limitation, the reasonableness of the length of time, scope and geographic coverage of such covenants.

5.19.    Full Disclosure.  No representation or warranty made by Seller or Seller Principal in this Agreement or any document, exhibit, statement, certificate or schedule attached to this Agreement or delivered by any of the foregoing at the Closing to Buyer in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state any material fact necessary in order to make the statement contained herein or therein not misleading.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

6.1.    Authority; No Conflict.

(a)    This Agreement constitutes the legal, valid and binding obligation of Buyer and is enforceable against Buyer in accordance with its terms, except as limited by bankruptcy and insolvency laws and by other laws affecting the rights of creditors generally.  Buyer has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and to perform its obligations under this Agreement.

(b)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will, directly or indirectly:

(i)    contravene, conflict with, or result in a violation of any contract or agreement to which Buyer is a party; or

(ii)    give any Governmental Body or other Person the right to challenge the transactions contemplated by this Agreement.

20

(c)     Except as set forth on Schedule 6.1, Buyer is not required to give any notice to or obtain any approval or consent from any Person in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

6.2.     Legal Proceedings. There is no legal proceeding that has been commenced by or against Buyer or that is otherwise related to or may affect the business of Buyer or that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, the transactions contemplated by this Agreement.

6.3.     Full Disclosure.  No representation or warranty made by Buyer in this Agreement, nor any document, exhibit, statement, certificate or schedule attached to this Agreement or delivered by Buyer at the Closing to Seller in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state any material fact necessary in order to make the statement contained herein or therein not misleading.

6.4 Brokers or Finders.  Except as set forth on Schedule 6.4, neither Buyer nor any of its Affiliates or agents has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents, commissions or other similar payment in connection with this Agreement or the transactions contemplated hereby.

**ARTICLE VII**
**COVENANTS**

7.1.     Employees and Employee Benefits.

(a)     Seller shall be responsible for payment of all compensation payable to all of the Business' employees through the Closing Date including those who are offered and accept employment by Buyer (the "***Rehired Employees***").  Seller will retain all of the Business' Employee Benefit Programs, including all employee benefit plans and pension plans, and Buyer will not assume obligations under any such programs.  Seller shall be fully and solely responsible for any costs, expenses, obligations and liabilities arising out of the pension or retirement obligations attributable to the Business' current or former employees related to the period prior to the Closing Date.

(b)     Buyer, in its sole discretion, shall determine what employee benefits will be made available to the Rehired Employees after the Closing Date.

(c)     Except as may be required by law, nothing contained in this Agreement shall (i) confer upon any Rehired Employee any right with respect to continuance of employment by Buyer or any of its affiliates, nor shall anything herein interfere with the right of Buyer or any such affiliate to terminate the employment of any of the Rehired Employees at any time after Closing, with or without cause, or restrict Buyer or any of its affiliates in the exercise of its independent business judgment in modifying any of the terms and conditions of the employment of the Rehired Employees after Closing or (ii) create any third party beneficiary rights in any current or former employee, director or consultant, any beneficiary or dependents thereof, or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and benefits that may be provided to any current or former employee,

4819-6388-5690, v. 20

director or consultant by Buyer or any of its affiliates or under any benefit plan which the Buyer or any of its affiliates may maintain.

(d)     At Closing, Seller shall provide Buyer with all employment related records reasonably requested by Buyer.

7.2.     Restrictive Covenants.

(a)     Except to the extent that Seller retains and operates its existing municipal contracts in the villages or towns of Rye Brook, Pelham and Carmel, Seller and Seller Principal covenant that, commencing on the Closing Date and ending on the fifth (5th) anniversary of the Closing Date (the "***Non-competition Period***"), neither Seller nor a Seller Principal shall, and each of them shall cause their respective Affiliates not to, directly or indirectly, engage in or have any interest, financial or otherwise, or accept employment from or serve in any capacity (such as owner, investor, director, lender, principal, agent, broker, consultant, partner or otherwise) with any company, other than Buyer or Buyer Affiliates, engaged in collection, transfer, transportation, disposal and/or recycling of waste or other recyclable material, or the brokerage of any of such activities anywhere within the Restricted Territory during the term of this Agreement. For purposes of this Agreement "***Restricted Territory***" shall mean (i) Westchester and Putnam Counties in the State of New York and (ii) any location within fifty (50) air miles of any place of business maintained by the Buyer or any of its Affiliates, excluding the State of Florida.

(b)     Seller and Seller Principal each covenant that during the period commencing on the Closing Date and ending on the seventh (7th) anniversary of the Closing Date (the "***Non-solicitation Period***"), neither Seller nor Seller Principal shall, directly or indirectly, and each of them shall cause their respective Affiliates not to, solicit or attempt to solicit or induce any customer, vendor, supplier, or other contractor of the Business as of the Closing Date, or the Buyer or any of its Affiliates during the Non-solicitation Period, to end, reduce or otherwise in any way adversely modify any business relationship such party may have with the Buyer or its Affiliates, or to violate any non-solicitation agreement, confidentiality agreement, non-disclosure agreement or any other restrictive covenant or agreement or other business relationship of any kind or nature such third party may have with the Buyer or any of its Affiliates.

(c)     Seller and Seller Principal each covenant that during the Non-solicitation Period, neither Seller nor Seller Principal shall, and each of them shall cause their respective Affiliates not to, solicit the employment or engagement of services of any person, other than immediate family members of Seller Principal, who is an employee of the Business as of the Closing Date and who is employed by Buyer following the Closing Date or is or was employed as an employee, consultant or contractor by Buyer or any of its Affiliates during the Non-solicitation Period on a full- or part-time basis.

(d)     Seller and Seller Principal acknowledge that the restrictions contained in this Section 7.2 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement.  Seller and Seller Principal acknowledge that any violation of this Section 7.2 will result in irreparable injury to Buyer and agree that Buyer shall be entitled to preliminary and permanent injunctive relief, without the necessity of proving actual

4819-6388-5690, v. 20

damages or posting a bond or other security, as well as an equitable accounting of all earnings, profits and other benefits arising from any violation of this Section 7.2, which rights shall be cumulative and in addition to any other rights or remedies to which Buyer may be entitled. Without limiting the generality of the foregoing, the Non-competition Period or the Non-solicitation Period, as applicable, shall be extended for an additional period equal to any period during which Seller, Seller Principal or any of their respective Affiliates is in breach of its obligations under this Section 7.2.

(e)     In the event that any covenant contained in this Section 7.2 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable law.  The covenants contained in this Section 7.2 and each provision thereof are severable and distinct covenants and provisions.  The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provisions in any other jurisdiction.

7.3.     <u>Business Confidential Information</u>.  It is understood that the trade secrets, customer lists, technology, know-how and any other confidential information of Seller that has been used in the Business (collectively, the "***Business Confidential Information***") is of a confidential nature.  Seller and Seller Principal agree that during the Non-solicitation Period, neither Seller, Seller Principal, nor their respective Affiliates will divulge or appropriate to their own use, or the use of any third party any of the Business Confidential Information, unless such Business Confidential Information prior to its use or disclosure by such Person can be shown to have been in the public domain or generally known or available to and legally usable by customers, suppliers or competitors of the Business without breach of the provisions of this Section 7.3 or other non-disclosure covenants.  Seller and Seller Principal agree that, in addition to any other available remedy, temporary or permanent injunctive relief may be granted in any proceeding which may be brought by Buyer to enforce such restrictive covenant without necessity of any proof that any other remedy at law is inadequate or the need to post a bond or other security.

7.4.     <u>Access to Records</u>.  From the date of this Agreement through the Closing Date, Seller and/or Seller Principal will provide Buyer and its counsel, accountants and other representatives full access during normal business hours to the properties, books, records, employees and representatives of Seller to make or cause to be made such investigations of the Business, the Assets and the Assumed Liabilities as Buyer deems necessary or advisable. Seller and/or Seller Principal shall allow Buyer and its counsel, accountants and other representatives reasonable access to books and records that, after the Closing, are in the custody or control of Seller and shall furnish to Buyer any other information concerning the Assets as Buyer reasonably requires in order to comply with its obligations under the law or under the contracts assumed by Buyer pursuant to this Agreement.

7.5.     <u>Transition Services</u>.  To the extent reasonably requested by Buyer to transfer customers, contracts, accounts and other Assets associated with the Business, Seller and Seller

Principal covenant that they each shall provide reasonable assistance to Buyer for a period of up to one hundred eighty (180) days following the Closing Date.

7.6.    Maintenance of Insurance Policies. Seller shall maintain all insurance policies relating to the Assets, including insurance policies covering registered vehicles, until such time after the Closing that the Buyer takes legal title to such Assets (such period, the "***Insurance Gap Period***").  To the extent that a casualty event relating to such Assets occurs during the Insurance Gap Period, Seller shall cooperate with Buyer to assert and prosecute a claim under any applicable insurance policies and shall deliver any proceeds of such insurance policies relating to such casualty event to Buyer.  Buyer shall use commercially reasonable efforts to obtain legal title to all Assets as soon as practicable after the Closing.

7.7.    Conduct of the Business. From the date of this Agreement through the Closing Date, Seller and Seller Principal shall (a) cause the Business to be conducted only in a reasonable and prudent manner in accordance with past practices, industry standards and regulatory requirements, (b) use best efforts to preserve the Seller's existing business and relationships with its employees, customers, suppliers and other third parties, and (c) maintain the Seller's equipment included in the Assets in good operating condition and in compliance with applicable Federal and State rules and regulations and otherwise protect and preserve its property. Without limiting the generality of the foregoing, Seller shall not enter into any contract, agreement or other arrangement with a third party, except for customer contracts entered into in the ordinary course of business, without the prior written consent of Buyer, which such consent shall not be unreasonably withheld by Buyer.

7.8.    Notices of Certain Events. Each of Seller and Seller Principal, on one hand and Buyer, on the other hand, will give prompt notice to the other party upon becoming aware of (a) the occurrence, or failure to occur, of any event which would be likely to cause any representation or warranty of such party contained in this Agreement to be untrue or inaccurate and (b) any failure on its part to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement on or prior to the Closing Date. The notifying party will use its best efforts to prevent or promptly remedy any matter which is or would be the subject of any such notice. No notice pursuant to this Section 7.8 will affect any representations or warranties, covenants, agreements, obligations or conditions set forth herein or otherwise affect any available remedies.

7.9.    Right of First Refusal.

(a)    During the period commencing on the date of the Closing Date and ending on the date that is the seventh (7th) anniversary of the Closing Date, if (i) Seller or Seller Principal shall obtain from a third party a bona fide written offer for the purchase of any Excluded Assets, including without limitation the existing contracts to provide waste removal services to governmental entities and/or the assets, vehicles and containers used to service those customers, (a "***Post-Closing Transaction***")  and (ii) Seller or Seller Principal desires to enter into such Post-Closing Transaction, such selling party(ies) (the "***Post-Closing Selling Party***") shall notify Buyer in writing (the "***Post-Closing Transfer Notice***") within fifteen (15) days of the receipt of any such bona fide written offer and shall identify (i) the assets contracts or business to be sold, "Related

Business", (ii) the identity of the proposed transferee, and (iii) the price and payment terms regarding the proposed Post-Closing Transaction.

(b)     Buyer and its Affiliates shall have the first right (the "***Post-Closing Right of First Refusal***") to purchase all (but not less than all) of the Related Business upon the terms provided in the Post-Closing Transfer Notice and this Section 7.9. The Post-Closing Selling Party and the Related Business will promptly provide the information and access reasonably requested by Buyer or its Affiliates to assist Buyer or its Affiliates in its evaluation of the proposed Post-Closing Transaction. If Buyer or its Affiliates desire to exercise the Post-Closing Right of First Refusal, it shall give written notice (the "***Notice of Exercise***") to that effect to the Post-Closing Selling Party within thirty (30) days after the Post-Closing Transfer Notice is delivered to Buyer. The Post-Closing Right of First Refusal shall be exercisable at the price and upon the payment and other terms set forth in the Post-Closing Transfer Notice, unless otherwise agreed to in writing by Buyer and the Post-Closing Selling Party.

(c)     Upon delivery of the Notice of Exercise of the Post-Closing Right of First Refusal, Buyer or its Affiliates, as purchaser, and the Post-Closing Selling Party, as seller, shall commence good faith negotiations regarding the execution of a definitive purchase and sale agreement for the purchase and sale of the Related Business (regarding the terms not otherwise set forth in the Post-Closing Transfer Notice and this Section 7.9). The parties shall use commercially reasonable efforts to consummate such purchase and sale not later than forty-five (45) days after the giving of the Notice of Exercise of the Post-Closing Right of First Refusal. If such purchase and sale transaction is not consummated within such period and the parties are actively negotiating such transaction, upon payment of an additional deposit in an amount to be negotiated not to exceed ten percent (10%) of the applicable purchase price, the Related Business shall nevertheless remain subject to the provisions of this Section 7.9 for an additional forty-five (45) days and the Post-Closing Selling Party may not otherwise consummate the Post-Closing Transaction with respect to the Related Business with the proposed transferee identified in the Post-Closing Transfer Notice unless and until the ninety (90) day period set forth in this Agreement has lapsed as a result of Buyer or its Affiliates' failure to negotiate in good faith.

(d)     If Buyer or its Affiliates do not exercise the Post-Closing Right of First Refusal with respect to the Related Business within thirty (30) days after the Post-Closing Transfer Notice is delivered to Buyer, then the Post-Closing Selling Party shall be entitled, to consummate the Post-Closing Transaction to the proposed transferee identified in the Post-Closing Transfer Notice on terms substantially similar to the terms set forth in the Post-Closing Transfer Notice.

7.10.    <u>Option to Purchase Vehicles</u>.  During the period commencing on the date of the Closing Date and ending on the first (1st) anniversary of the Closing Date, Buyer shall have the exclusive option to purchase, or assume the applicable lease of, any or all of the vehicles listed on Schedule 7.10 (the "***Option Vehicles***").  Buyer may purchase or assume the lease of an Option Vehicle by providing written notice to Seller or its exercise of such option identifying the vehicle or vehicle the notice is applicable to and setting forth a closing date not to exceed 10 business days after delivery of such notice.  The purchase price, if applicable, shall  be the greater of the then wholesale value of the applicable Option Vehicle or the payoff amount of any vehicle financing. Any lease assumed shall be on its then current terms.   Seller shall deliver Option Vehicles free

and clear of all liens and encumbrances other than any assumed lease, if applicable. Buyer may deliver multiple notices prior to the date the option in this Section 7.10 expires.

**ARTICLE VIII**
**CONDITIONS TO CLOSING; TERMINATION**

8.1.    <u>Conditions to the Buyer's Obligation to Close</u>. The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction of the conditions of Section 8.3 and to the satisfaction (or waiver in writing by Buyer at or prior to the Closing Date) of the following conditions:

(a)    The representations and warranties of Seller and Seller Principal contained in this Agreement or in any schedule, exhibit, or certificate delivered by Seller and/or Seller Principal in connection herewith shall be true and correct in all respects on and as of the Closing Date as though newly made on and as of the Closing Date;

(b)    The Seller and Seller Principal shall have performed and complied with all of the covenants and agreements required to be performed by each Party under this Agreement, in all respects through the Closing Date;

(c)    No writ, judgment, decree, injunction or order shall have been entered and not withdrawn which would prevent the performance of this Agreement or the consummation of the transaction contemplated by this Agreement, declare unlawful the transaction contemplated by this Agreement, or cause such transaction to be rescinded;

(d)    During the period from the date hereof through the Closing Date, the Business shall have operated in a normal and customary manner, there shall have been no material losses, costs or expenses outside of the ordinary course of business, and there shall have been no other change in the properties, prospects, financial condition or results of the Business which either individually or in the aggregate has caused or could cause a Material Adverse Effect;

(e)    No claim, action, suit, arbitration, investigation or other legal or administrative proceeding shall have been instituted or threatened by parties other than Buyer prior to the Closing pertaining to the transaction contemplated hereby, the result of which could, in the Buyer's reasonable judgment, either prevent or make illegal the consummation of such transaction, or have a Material Adverse Effect;

(f)    Any consent, approval, authorization or order of, or filing with, or from, any court, governmental agency (including, without limitation, the approval of the Westchester County Solid Waste Commission), administrative body or other third party (including Buyer's financial institution) required for the consummation of this transaction contemplated by this Agreement shall have been made or obtained, as the case may be, and shall be in effect on the Closing Date;

(g)    Seller and Seller Principal shall have delivered, or caused to be delivered, to Buyer the closing deliverables set forth in Section 4.2 of this Agreement;

(h)    Buyer shall have closed on debt and/or equity financing on terms and conditions satisfactory to Buyer;

(i)     Buyer shall have received approval of its shareholders and any other corporate approval required to consummate the transactions contemplated by this Agreement;

(j)     Buyer shall have received Form AU-197.1 (Purchaser's Release – Bulk Sale) from the New York Department of Tax and Financing confirming that Seller does not have any unpaid sales tax;

(k)     Seller and Seller Principal shall have delivered to Buyer a certificate, signed by a duly authorized officer, member or manager of Seller, to the effect that each of the conditions specified in Section 8.1(a)-(f) are satisfied in all respects (the "***Seller Closing Certificate***"); and

(l)      Seller shall have delivered, or caused to be delivered to Buyer a certificate of an Officer or Director (or equivalent) of Seller certifying that attached thereto are complete and correct copies of all resolutions adopted by the equity owners of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby (the "***Seller Secretary's Certificate***").

8.2.     <u>Conditions to the Seller and Seller Principal's Obligation to Close</u>. The obligations of the Seller and Seller Principal's to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction of the conditions of Section 8.3 and to the satisfaction (or written waiver by Seller and/or Seller Principal, as applicable at or prior to the Closing Date) of the following conditions:

(a)     The representations and warranties of Buyer contained in this Agreement or in any schedule, exhibit, or certificate delivered by Buyer in connection herewith shall be true and correct in all respects on and as of the Closing Date as though newly made on and as of the Closing Date;

(b)     The Buyer shall have performed and complied with all of the covenants and agreements required to be performed by it under this Agreement, in all respects through the Closing Date;

(c)     No writ, judgment, decree, injunction or order shall have been entered and not withdrawn which would prevent the performance of this Agreement or the consummation of the transaction contemplated by this Agreement, declare unlawful the transaction contemplated by this Agreement, or cause such transaction to be rescinded;

(d)     Buyer shall have delivered, or caused to be delivered, to Seller the closing deliverables set forth in Section 4.3 of this Agreement; and

(e)     Buyer shall have delivered to Seller and Seller Principal a certificate signed by a duly authorized officer of the Buyer, to the effect that each of the conditions specified in Section 8.2(a)-(c) are satisfied in all respects (the "***Buyer Closing Certificate***").

8.3. <u>Bankruptcy Condition</u>. The obligations of Buyer and Seller under this Agreement are subject to the satisfaction or waiver by Buyer or Seller, as applicable, of the following conditions precedent on or before the Closing:

(a) Seller shall have filed a motion or motions for approval under Sections 363 and 365 of the Bankruptcy Code of (1) the sale of the Assets and assumption and assignment of the Assigned Contracts and assumption of the Assumed Liabilities pursuant to the terms of this Agreement and the transactions hereunder (the "***Transaction***"); (2) the sale of the Assets to Buyer free and clear of liens, claims and interests, to the fullest extent possible under Section 363(f) of the Bankruptcy Code; and (3) the form of this Agreement;

(b) The Bankruptcy Court shall have entered the Sale Order, a form of which is attached hereto as **<u>Exhibit A</u>** (the "***Sale Order***") and is approved by the Parties, which Sale Order must be final and non-appealable and shall include a finding that Buyer has purchased the Assets in "good faith" within the meaning of Bankruptcy Code Section 363(m); and

(c) No court order by the Bankruptcy Court shall have been entered in any action or proceeding instituted by any person that enjoins, restrains, or prohibits the consummation of the transactions contemplated hereby.

8.4. <u>Termination</u>. This Agreement may be terminated prior to the Closing:

(a) By mutual written agreement of all of the Parties at any time;

(b) By written notice from Buyer to Seller if there has been a breach of any representation, warranty, covenant or agreement by Seller and/or Seller Principal that would give rise to the failure of any of the conditions set forth in Sections 8.1(a) or (b) of this Agreement, and which is either not capable of being cured or, if such breach is capable of being cured, is not so cured within a reasonable amount of time (and in any event prior to the date set forth in 8.3(f));

(c) By written notice from Seller to Buyer if there has been a breach of any representation, warranty, covenant or agreement by Buyer that would give rise to the failure of any of the conditions set forth in Sections 8.2(a) or (b) of this Agreement, and which is either not capable of being cured or, if such breach is capable of being cured, is not so cured within a reasonable amount of time (and in any event prior to the date set forth in 8.4(f));

(d) By written notice from Buyer to Seller in the event that the approval of the Westchester County Solid Waste Commission with respect to the transactions contemplated hereunder shall have been denied; or

(e) By written notice from Buyer to Seller in the event the Closing shall not have occurred on or before December 31, 2019 for any reason other than undue delay or nonperformance of this Agreement by the Buyer.

8.5. <u>Effect of Termination</u>. In the event this Agreement is terminated pursuant to Section 8.5, this Agreement (other than with respect to this Article XIII and Article IX) shall thereafter become void and have no effect, and there shall be no liability on the part of any Party

4819-6388-5690, v. 20

in respect thereof, except that nothing herein will relieve any party from liability for any breach of this Agreement.

## ARTICLE IX
## INDEMNIFICATION; REMEDIES

9.1. <u>Indemnification by Seller and Seller Principal</u>. Seller and Seller Principal, jointly and severally, agree to indemnify and hold harmless Buyer, its Affiliates and successors and assigns (collectively with Buyer, "***Buyer's Indemnified Persons***"), and shall reimburse Buyer's Indemnified Persons for, from and against each and every demand, claim, loss (which shall include any diminution in value), liability, judgment, damage, cost and expense (including, without limitation, interest, penalties, costs of preparation and investigation, and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors) (collectively, "***Losses***") imposed on or incurred by Buyer's Indemnified Persons, directly or indirectly, relating to, resulting from or arising out of:

(a) any inaccuracy in any representation or warranty of Seller or Seller Principal set forth in this Agreement in any respect, whether or not Buyer's Indemnified Persons relied thereon or had knowledge thereof, or any non-performance or nonfulfillment of any covenant, agreement or other obligation of Seller or Seller Principal under this Agreement, the Schedules hereto or any certificate or other document delivered or to be delivered pursuant hereto;

(b) any Excluded Liability or Excluded Asset;

(c) any services provided by the Seller prior to the Closing Date;

(d) any tax liability incurred by Buyer as a result of a breach of the representations and warranties of Seller or Seller Principal in Section 5.3;

(e) any claims for commissions or fees by a broker, finder or other person set forth on <u>Schedule 5.17</u>;

(f) any condition, environmental or otherwise, relating to the Assets existing before the Closing Date, whether or not to Seller's Knowledge; and

(g) the operation of the Seller or the Business, or ownership of the Assets, prior to the Closing Date.

9.2. <u>Indemnification by Buyer</u>. Buyer shall defend, indemnify and hold harmless Seller, its Affiliates and their respective successors and assigns (Seller and such Persons, collectively, the "***Seller's Indemnified Persons***") and shall reimburse Seller's Indemnified Persons for, from and against all Losses imposed on or incurred by Seller's Indemnified Persons, directly or indirectly, relating to, resulting from or arising out of:

(a) any material inaccuracy in any representation or warranty in any respect, whether or not Seller's Indemnified Persons relied thereon or had knowledge thereof, or any nonperformance or nonfulfillment of any covenant, agreement or other obligation of Buyer under this Agreement or any certificate or other document delivered or to be delivered pursuant hereto;

<blockquote>

(b)      any Assumed Liabilities;

(c)      any services provided by Buyer following the Closing Date; and

(d)      any claims for commissions or fees by a broker, finder or other person set
</blockquote>

forth on <u>Schedule 6.4.</u>

9.3.    <u>Procedures for Payments of Indemnification Obligations</u>.  All indemnification obligations by any indemnifying Person hereunder shall be effected by payment of cash, delivery of a cashier's or certified check, or wire transfer of immediately available funds, or in the case of any indemnification obligation of Seller or Seller Principal, at the election of Buyer's Indemnified Persons, from the Escrow Amount.  Buyer and the Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to make any distributions from the Escrow Amount to which Buyer is entitled pursuant to this Article IX.

9.4.    <u>Survival</u>.  The representations and warranties of the Parties contained in or made pursuant to this Agreement shall be deemed to have been made on the Closing Date, shall survive the Closing Date and shall remain operative and in full force and effect for the period ending twenty-four  (24) months after the Closing Date (the "***Survival Period***"); provided that if on or prior to the expiration of the Survival Period, a notice of claim for indemnification shall have been given, the indemnified party shall continue to have the right to be indemnified with respect to such indemnification claim until such claim for indemnification has been satisfied or otherwise resolved as provided in this Article IX; and provided further that the representations and warranties contained in Sections 5.1 (Organization; Ownership), 5.2 (Authority No Conflict), 5.3 (Taxes), 5.15 (Environmental), 5.17 (Title to Assets), 5.18 (Brokers or Finders), and 6.1 (Authority; No Conflict) and all covenants and agreements made by any Party hereunder which are to be performed after the Closing Date shall survive without time limit, with the exception of Sections 9.1(a) and 9.2(a), which shall only remain operative and in full force and effect as long as indemnification with respect to the underlying representation and warranty remains available in accordance with the foregoing provisions of this Section 9.4 (including as extended pursuant to the first proviso hereof).

**ARTICLE X**
**MISCELLANEOUS**

10.1.    <u>Exhibits and Schedules</u>.  The Exhibits and Schedules to this Agreement are a part of this Agreement as if set forth in full herein.

10.2.    <u>Publicity</u>.  No public announcements regarding the transactions contemplated by this Agreement shall be made by Seller or Seller Principal without the prior approval of Buyer. The foregoing restrictions shall not apply to the extent that Seller or Seller Principal is required to make disclosure by law or by the applicable regulations or policies of any Governmental Body where prior consultation with Buyer is not practicable.

10.3.    <u>Notices</u>.  Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, sent by certified or registered mail, postage prepaid, return receipt requested, sent by facsimile transmission or delivered by overnight

courier to Buyer or Seller at the following addresses (or to such other addresses as any such Party may from time to time specify in writing pursuant to this Section 10.3):

|                    |                                    |
|--------------------|------------------------------------|
| if to Seller:      | Waste Services, Inc.               |
|                    | 444 East Boston Post Road          |
|                    | Suite 210                          |
|                    | Mamaroneck, New York 10543         |
|                    | Attn: Joseph F. Spiezio, III       |
|                    |                                    |
| With copy to:      | Spolzino Smith Buss & Jacobs LLP   |
|                    | 733 Yonkers Avenue                 |
|                    | Yonkers, NY 10704                  |
|                    | Attn: Jeffrey D Buss, Esq.         |
|                    |                                    |
|                    | Klestadt Winters                   |
|                    | 200 West 41st Street          |
|                    | 17th Floor                    |
|                    | New York NY 10036-7203             |
|                    | ATTN: Tracy Klestadt, Esq.         |
|                    |                                    |
| if to Buyer to:    | Oak Ridge Waste and Recycling of CT, LLC |
|                    | 307 White St.                      |
|                    | Danbury, Connecticut 06813         |
|                    | Attn: John Decker                  |
|                    |                                    |
| with a copy to:    | Whiteman Osterman & Hanna LLP      |
|                    | One Commerce Plaza                 |
|                    | Albany, New York 12260             |
|                    | Attn: Charles R. Haviland, Jr., Esq. |

Any such notice or communication that is addressed as provided in this Section 10.3 will be deemed given (a) upon delivery, if delivered personally; (b) on the third business day after deposit in a regular depository of the United States mails, if delivered by United States mail; and (c) on the first business day after the delivery to the courier, if delivered by overnight courier, whichever is sooner.

10.4.    <u>Entire Agreement</u>. This Agreement (including all Exhibits and Schedules hereto and all agreements or covenants therein) contains the entire agreement among the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements or understandings, written or oral, with respect thereto.

10.5.    <u>Waivers and Amendments</u>. This Agreement may be amended, modified, superseded, cancelled, renewed, or extended, and the terms and conditions hereof may be waived only by a written instrument which specifically references this Agreement and which is signed by the Parties or, in the case of a waiver, signed by the Party waiving compliance. No delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any Party of any right, power or privilege hereunder,

nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any Party may otherwise have at law or in equity.

10.6.     Expenses. Except as otherwise provided herein, all expenses (including, without limitation, legal fees and expenses, fees of brokers and advisors and investment bankers and fees and expenses of accountants) incurred in connection with the transactions contemplated hereby will be borne by the Party incurring such expenses.

10.7.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of law principles thereof. Venue for the adjudication or resolution of any disputes or claims arising under this Agreement shall be in a court of competent jurisdiction situated in the State of New York.

10.8.     Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and legal representatives.  This Agreement is not assignable by the Parties, except by Buyer to one or more of its Affiliates or its successor pursuant to a merger, consolidation or asset sale transaction.  Nothing contained in this Agreement shall be deemed to confer any right or benefit upon any Person other than the Parties hereto to the extent herein provided.

10.9.     Variations in Pronouns. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

10.10.   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.11.   Further Assurances.  Each of the Parties shall execute such documents and other papers and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby.

10.12.   Headings; Severability.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.  Each and every provision of this Agreement shall be treated as separate and distinct and, in the event of any provision hereof being declared invalid, such invalid provision shall be deemed amended to the extent required to make it valid and enforceable and such amended provision and the remaining provisions of this Agreement shall remain in full force and effect if such does not defeat the intent of this Agreement.

10.13.   Mutual Drafting. The Parties have had the opportunity to be represented by counsel throughout the transactions contemplated by this Agreement and in connection with the negotiation and drafting of this Agreement and any agreements and instruments executed in connection herewith.  The Parties agree that this Agreement will be construed as drafted jointly by the Parties, and no presumption or burden of proof will apply favoring or disfavoring any Party to this Agreement by virtue of the authorship of any of the provisions of this Agreement.

[Signature Page Follows]

4819-6388-5690, v. 20

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by each of the Parties or by duly authorized representatives of such Parties, on the date first above written.

BUYER:

**OAK RIDGE WASTE AND RECYCLING OF CT, LLC**

By: _____

Name: John Decker

Title: Chief Executive Officer

SELLER:

**WASTE SERVICES, INC.**

By: _____

Name: Joseph F. Spiezio, III

Title: Chief Executive Officer

SELLER PRINCIPAL:

_____

Joseph F. Spiezio, III

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by each of the Parties or by duly authorized representatives of such Parties, on the date first above written.

BUYER:                    OAK RIDGE WASTE AND RECYCLING OF CT, LLC

                          By: _____
                          Name:  John Decker
                          Title:   Chief Executive Officer

SELLER:                   WASTE SERVICES, INC.

                          By: _____
                          Name:  Joseph F. Spiezio, III
                          Title:   Chief Executive Officer

SELLER PRINCIPAL:

                          _____
                          Joseph F. Spiezio, III

Exhibit A

Form of Sale Order

[See Attached]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| WASTE SERVICES, INC.[1], | : | Case No. 19-22260 (RDD) |
|  | : |  |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

## ORDER, PURSUANT TO 11 U.S.C. §§ 363(B), (F), AND (M) AND RULES 2002 AND 6004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE: (I) APPROVING THE ASSET PURCHASE AGREEMENT; (II) AUTHORIZING THE DEBTOR TO CLOSE ON THE SALE BY EXECUTING THE ASSET PURCHASE AGREEMENT; AND (III) GRANTING RELATED RELIEF

Upon the motion dated April __, 2019 (the "Sale Motion"), of Waste Services, Inc. (the "Seller" or "Debtor"), as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), seeking, among other things, entry of an order, pursuant to sections 363 and 365 of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking the entry of an Order (the "Sale Order") approving the Sale[2] of the Debtor's interests in certain Assets to Oak Ridge Waste and Recycling of CT, LLC ("Oak" or "Buyer") free and clear of all Encumbrances; and upon the affidavit of Joseph F. Spiezio, III ("Spiezio Affidavit"), sworn to on April __, 2019, which is annexed to the Sale Motion as Exhibit A; and no objections to the relief granted in this Sale Order having been filed or received or any such objections having been withdrawn or overruled on their merits; and consideration of the Sale Motion having been heard before this Court on May __, 2019, (the "Hearing"), the record of which is incorporated herein; and due and appropriate notice of the Sale Motion having been given; and it appearing that no

---

[1] The Debtor's principal office is located at 444 E. Boston Post Road, Suite 210, Mamaroneck, New York 10543. The last four digits of its taxpayer identification number are 1432.
[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

other notice of the relief granted by this Sale Order need be given; and good and sufficient cause having been shown for the relief granted herein; it is hereby

**FOUND AND DETERMINED THAT**:

A.     Proper, timely, adequate and sufficient notice of the Sale Motion has been provided to all known creditors and parties in interest in the Debtor's bankruptcy case.

B.     A reasonable opportunity to object or be heard regarding the relief granted in this Sale Order has been provided to parties in interest, including (i) the Office of the United States Trustee, (ii) holders of Encumbrances on the Assets, (iii) all creditors and parties in interest in the Debtor's case, (iv) all parties having filed a notice of appearance and request for service of papers in the Debtor's case, and (v) any other parties which are required to receive notice pursuant to Fed. R. Bankr. P. 2002.

C.     The consideration being paid by the Buyer to acquire the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the laws of the State of New York, the laws of the United States and any state, territory or possession thereof, and the District of Columbia.

D.     The consummation of the Sale to the Buyer pursuant to the Agreement will serve the best interests of the Debtor's estate by maximizing the value to be obtained from the Assets. The Debtor has demonstrated a good, sufficient and sound business purpose and justification for the Sale because, among other things, the Debtor and its advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Assets and determined that (i) the transfer to the Buyer of the Assets pursuant to the Agreement and (ii) the consideration

to be paid in the Purchase Price is fair and reasonable and together constitutes the highest and otherwise best value obtainable for the Assets.

E.      The Buyer is a good faith purchaser and is entitled to all the protections of a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

F.      The consummation of the Sale pursuant to this Sale Order and the Agreement is a legal, valid and effective sale of the Assets to the Buyer and shall vest the Buyer with all right, title, privilege and interest in and to the Assets free and clear of all Encumbrances, with such Encumbrances to attach to the proceeds of Sale with the same priority, validity, force and effect as they attached to such Assets immediately before the closing of the Sale. All holders of Encumbrances are enjoined from taking any action, including the assertion or exercise of any right of set-off or recoupment, or asserting any claim under theories of successor liability against the Buyer, or its successors, designees or assigns to recover any claim which such entity has solely against the Debtor.

G.      Entry of this Sale Order is in the best interests of the Debtor, the Debtor's estate, creditors and other parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      All objections to the Sale or the relief requested in the Sale Motion that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

2.      The terms and conditions of the Sale are hereby approved in all respects pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

3.     The Debtor is hereby authorized and empowered to sell, transfer, convey and assign the Debtor's right, title and interest in the Assets to the Buyer in accordance with the terms and conditions of the Agreement.

4.     Except as otherwise expressly permitted by the Agreement and this Sale Order, upon consummation of the transactions contemplated by the Agreement, the Assets shall be transferred to the Buyer free and clear of all Encumbrances, including but not limited to, creditors, governmental, tax, and regulatory authorities and secured lenders, holding any and all claims in, on or against the Assets, or any portion thereof (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent), or arising under, in connection with, or in any way relating to the Assets prior to the Sale, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer or its successors or assigns, its property, or the Assets, such persons' or entities' claims in and on the Assets, with all such claims to attach to the proceeds of Sale with the same force and effect they had against the Assets.

5.     Each creditor holding an Encumbrance, on or against the Assets is authorized and directed to promptly execute and deliver such documents and take all other actions as may be reasonably requested by the Debtor or Buyer to evidence the release of its Encumbrance in and on the Assets.

6.     This Sale Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may

be required to report or insure any title or state of title in or to the Assets. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the Agreement.

7.      The terms and conditions of the Agreement and this Sale Order shall be binding in all respects upon the Debtor, the Buyer and their respective affiliates, successors and assigns, including, without limitation, any affected third parties and all persons asserting a claim against or interest in the Debtor's estate or the Assets.

8.      The Debtor is authorized to satisfy any uncontested Encumbrances against the Assets as soon as is practicable following the closing on the Sale.

9.      The Buyer is a good faith purchaser and is entitled to all the protections of a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

10.     The Debtor is authorized pursuant to 11 U.S.C. § 365(a) to assume and assign the Assigned Contracts as set forth in section 3.6 and Schedule 2.1 of the Agreement.

11.     Pursuant to 11 U.S.C. §§ 105(a) and 365, the Debtor's assumption and assignment of the Assigned Contracts to Buyer, on the terms contained in the Agreement, is approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect thereto are deemed satisfied. The assignment by the Debtor of the Assigned Contracts to Buyer pursuant to 11 U.S.C. § 365(f) is binding on the counterparties to those contracts.

12.     Upon Closing pursuant to the Agreement, the Assigned Contracts shall be assigned, transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their terms, notwithstanding any provision in the Assigned Contracts (including, without limitation, those described in Sections 365(b)(2) and (1) of the Bankruptcy Code) that prohibits,

restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtor

is hereby relieved from any further obligation or liability for any breach of the Assigned Contracts.

13.     The cure amount as set forth in (i) any relevant cure notice or (ii) any stipulation

entered into between the Debtor and the counterparty to an Assigned Contract, as applicable, shall

be controlling notwithstanding anything to the contrary in any Assigned Contract or other

document, and the counterparty to each Assigned Contract shall be forever barred from asserting

any other claim arising prior to the date of entry of this Sale Order against either the Debtor or the

Buyer.

14.     The failure of the Debtor or Buyer to enforce any term or condition of any Assigned

Contract shall not constitute a waiver of such term or condition or of the Debtor's or the Buyer's

rights to enforce every term and condition of the Assigned Contracts.

15.     The stay required by Bankruptcy Rule 6004(h) is hereby waived.

16.     This Court shall retain jurisdiction to, among other things, interpret and enforce the

terms and provisions of this Sale Order and the Agreement, and to adjudicate, if necessary, any

and all disputes concerning or relating to the transactions contemplated hereby and thereby,

including disputes from third parties concerning the Sale of the Property free and clear of all liens.

Dated: White Plains, New York
          April __, 2019

 

                                  _____
                                  HONORABLE ROBERT D. DRAIN
                                  UNITED STATES BANKRUPTCY JUDGE